**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 1, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

WILLIAM JAMES DIESTEL,

        Petitioner - Appellant,

   v.

REGINALD HINES, Warden,
Lexington Correctional Center,
Lexington, Oklahoma,

        Respondent - Appellee.

No. 06-7070

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 03-CV-170-JHP)**

---

Burke Mordy, Mordy & Mordy, P.C., Ardmore, Oklahoma (Andrea D. Miller, Oklahoma City, Oklahoma, and Phil S. Hurst, Hurst, McNeil & Gordon, Sulphur, Oklahoma, with him on the brief) for Petitioner - Appellant.

Keeley Lane Harris, Assistant Attorney General (W.A. Drew Edmonson, Attorney General, with him on the brief), Oklahoma City, Oklahoma, for Respondent - Appellee.

---

Before **HENRY**, **LUCERO**, and **HARTZ**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

    William James Diestel was convicted of first-degree murder in Oklahoma

state court. After the Oklahoma Court of Criminal Appeals (OCCA) affirmed his conviction, he filed in the United States District Court for the Eastern District of Oklahoma an application for habeas relief under 28 U.S.C. § 2254, raising two claims: (1) the state did not present sufficient evidence to prove beyond a reasonable doubt that he was sane at the time of the offense, and (2) his due-process rights were violated because the court did not instruct the jury about the consequences of a verdict of not guilty by reason of insanity. Although a magistrate judge recommended that relief be granted on the first of these claims (sufficiency of the evidence), the district court denied relief on both claims. Mr. Diestel appealed. We have granted a certificate of appealability (COA) on both claims. *See* 28 U.S.C. § 2253(c)(1) (requiring a COA to appeal denial of habeas application).

We have jurisdiction under 28 U.S.C. § 1291 and affirm. On the first issue, we hold that there was enough evidence at trial for the jury to find beyond a reasonable doubt that Mr. Diestel could distinguish right from wrong at the time of his offense. On the second, we hold that the OCCA's decision was not contrary to federal constitutional law set forth by the United States Supreme Court.

## I. BACKGROUND

### A. The Killing

The facts of the killing are substantially undisputed, except for Mr. Diestel's state of mind at the time. In October 2000 Mr. Diestel traveled from California to Oklahoma to seek out the victim, Doug Casey, a former acquaintance from Santa Paula, California. On October 27 he stopped at the home of Helen Scott and asked for directions to the Casey residence. About 11:45 a.m. he arrived at the Casey residence and spoke to Carolyn Casey, the victim's mother, saying that he was Doug Casey's friend. She told him that Casey was at work at the Chickasaw Point Golf Course.

Mr. Diestel went to the golf course and inquired about Casey. Upon being informed that Casey would be working a while longer, Mr. Diestel waited at a restaurant at the golf course. When Casey came into the restaurant with a colleague before his workday ended, Mr. Diestel appeared to be using a newspaper to hide himself from Casey's view.

Casey clocked out of work between 2:30 and 3:00 p.m. and headed for the parking lot. Mr. Diestel approached him and said, "[D]o you remember me?" Supp. R. Vol. II at 303. Casey responded, "[O]h shit!" and ran away. *Id.* Mr. Diestel drew a gun and fired several times. After Casey had rounded a corner and was out of sight, Mr. Diestel returned to his car and left the area. Casey had been shot in the neck; the bullet severed his carotid artery, and he bled to death.

3

Local police were informed of the shooting, and Mr. Diestel was soon stopped by Sergeant Duke Remington of the Kingston Police Department. Mr. Diestel got out of his car and put his hands in the air before Remington was able to stop his own vehicle. When Mr. Diestel was arrested, he said that he had shot Casey because Casey had raped a girl and set fires in California. He then asked about Casey's condition, telling another officer that he had not intended to kill him.

**B.    The Trial**

At trial Mr. Diestel did not deny the shooting; instead, he claimed that he was insane at the time. Under Okla. Stat. tit. 21, § 152(4), people are not capable of committing crimes if they are "temporarily or partially deprived of reason, upon proof that at the time of committing the act charged against them they were incapable of knowing its wrongfulness." In evaluating claims of insanity Oklahoma courts have held that "a defendant was legally insane if during the commission of the crime he was suffering from a mental disease or defect rendering him unable to differentiate between right and wrong." *Pugh v. State*, 781 P.2d 843, 844 (Okla. Crim. App. 1989) (internal quotation marks omitted). This is part of the M'Naghten test, which also states that a defendant is insane if suffering from a mental disease or defect "rendering him . . . unable to understand the nature and consequences of his acts." *Id.*

Mr. Diestel's defense was that he could not tell right from wrong because

4

he was afflicted with paranoid schizophrenia. He claimed that this disease caused him to hallucinate that he was visited by angels and to have delusions that Casey embodied the evil Emperor Nero, whom Mr. Diestel needed to apprehend. In support of this defense, Mr. Diestel called several members of his family to testify about his history of mental illness. He also called two mental-health experts, one of whom, Dr. John R. Smith, testified that Mr. Diestel was legally insane because he could not distinguish right from wrong at the time of the shooting.

We summarize the relevant trial testimony in some detail.

### 1. Lay Witnesses

### a. State's Witnesses

The state called several witnesses who described Mr. Diestel's behavior before, during, and after the shooting. They did not express opinions on Mr. Diestel's sanity, but their observations could form part of the basis of the opinions of others, including the jury.

Helen Scott, whose house Mr. Diestel had approached when searching for the Casey residence, said that Mr. Diestel asked for directions to that residence and that she gave them to him. Mr. Diestel was "a clean-cut guy, nice-looking, well-dressed." Supp. R. Vol. II at 235. Nothing he said or did caused her any concern. He appeared to know where he was and the purpose of his visit.

Charles Wayne Canaday and Wesley Chaney, two employees at the golf

5

course who encountered Mr. Diestel, recalled that Mr. Diestel was hard to understand and was slurring his words somewhat. Although nothing about Mr. Diestel's demeanor was of concern, Canaday recalled Mr. Diestel being "a little bit nervous." *Id.* at 242. Mr. Diestel appeared to know where he was, and he asked about nobody other than Casey.

Melony Velock, a golf-course employee who served Mr. Diestel in the golf course's restaurant, said that Mr. Diestel sat at the restaurant's bar. He ordered a beer. She chatted briefly with him, both observing that they were not from Oklahoma. But Velock said that Mr. Diestel "gave me the creeps [because m]ost people talk to me and are very social with me and he wasn't. He was very quiet and very—he wasn't very social." *Id.* at 255. Mr. Diestel then ordered a sandwich. While Mr. Diestel was still there, Casey entered the restaurant with another person. Velock's testimony continued as follows:

> Q: Now, with respect to Mr. Diestel, did he do anything that drew your attention when Mr. Casey came in?
> A: Somebody had said somebody was looking for Doug [Casey]. So I told Doug and I was teasing him about being a female and stuff. He said, you don't know who it is, and I said, no. Then he said, oh, and then I went back to the bar to ask the gentleman if he needed anything else and he was sitting at the bar with a newspaper facing over that direction and it was wide open.
> Q: From the appearance you indicated that Mr. Diestel had turned sideways and raised a paper up?
> A: Yes.
> Q: Did you believe that when he did so he was basically trying to secrete himself?
> A: I just thought it was weird that it was not sitting on the

6

> counter. Most people have it folded up and are reading it while they're sitting there and he had it wide open.
>
> Q: Was it of such a manner that, in fact—
>
> A: Nobody could have seen him.
>
> Q: Could he have even read the paper in the manner in which he was holding it?
>
> A: I don't know.

*Id.* at 256–57. When Casey left the restaurant, Mr. Diestel folded the newspaper and put it down. After that, he and Velock chatted some more, and he ordered a hamburger and another beer. On cross-examination Velock said that Mr. Diestel's positioning of the newspaper had not struck her as "weird until after the fact." *Id.* at 262.

Several golf-course employees testified about the shooting itself. Terry Gable was a greenskeeper. At 2:30 p.m. Gable, along with Curtis Ferrell and Casey, was getting ready to leave for the weekend. Ferrell stayed behind at the course, while Gable and Casey walked toward their cars in the golf course's parking lot. Mr. Diestel drove his truck, which had been parked at the lot, "up behind [Casey's car] so he couldn't move." *Id.* at 303. Mr. Diestel got out and walked up to Casey. He asked, "[A]re you Doug Casey?" and then "[D]o you remember me?" *Id.* at 305. "[A]bout a split-second" later Casey said, "[O]h shit," *id.* at 276, and began to run away. Mr. Diestel braced himself on his truck and fired three shots from what looked like a black handgun. When Casey continued running, Mr. Diestel pursued and fired a second series of shots. Then, according to Gable, Mr. Diestel

7

> basically just pulled his gun down like he was looking at it. He sort of just looks up at me—I'm directly right in front of him—like he just, I don't know, was checking his gun. I figured he emptied his clip or whatever. He just pulled his gun down after he gets through firing and just sort of glances up at me and then goes back to looking at his gun and basically just turns and starts slowly walking back to his truck.

*Id.* at 281. Gable observed that Mr. Diestel was fairly calm: "He just sort of [gave] me this little look. I'm right there in front of him and then just casually turns and starts heading toward his truck." *Id.* at 296. By this point Casey was out of Gable's sight. Gable drove away and parked his car on the path Mr. Diestel would need to use to leave the golf course, "hoping to get the tag number off the truck." *Id.* at 281. He was unable to obtain the license-plate number, but he saw Mr. Diestel "dr[i]ve by pretty calmly. He didn't speed or whatever." *Id.* Gable returned to the scene of the shooting to find Ferrell tending to Casey "in a pool of blood." *Id.* at 282.

John Rock, another greenskeeper, testified that he had seen Mr. Diestel driving his truck earlier. "Usually when you see somebody for the first time you can usually tell maybe what kind of mood they're in. He didn't look happy. It was almost like he was upset at me or something." *Id.* at 322.

The next several witnesses for the state were police officers and other government employees who responded to Mr. Diestel's shooting. Sergeant Remington was the officer who stopped Mr. Diestel after he was informed by radio dispatch that there had been a shooting at the golf course. When he saw

8

Mr. Diestel's truck, he activated his emergency lights. "Before I ever pulled up and got stopped behind the vehicle a white male had exited the vehicle with his hands raised in the air. At that time I told the subject to lay down on the ground and he complied." *Id.* at 358. He then approached Mr. Diestel, handcuffed him, patted him down, and found a knife. The testimony continued as follows:

> Q: Did Mr. Diestel say anything at the time you approached him?
> A: Yes, sir, he did.
> Q: What was the first thing he said?
> A: After I handcuffed him he had stated the only reason he did it was because he raped a girl and set a bunch of fires in California.
> Q: Was that his total statement?
> A: Yes, sir.

*Id.* at 360. Remington then advised Mr. Diestel not to speak before being advised of his *Miranda* rights, but Mr. Diestel repeated that "the only reason I did it is because he raped a girl and set a bunch of fires in California." *Id.* A first responder then reported on Remington's police radio that Casey had stopped bleeding. Remington said that "[a]t this time, Mr. Diestel then asked me, is he going to be okay?" *Id.* at 361. Mr. Diestel "seemed to be very calm" and "was not shaken up in any way." *Id.* He was compliant and obedient, and he responded as if he understood Remington's directions. Inside Mr. Diestel's vehicle Remington saw a black semiautomatic pistol, a Bible, and newspaper clippings apparently discussing forest fires in California.

Tony Damron of the Marshall County Sheriff's Office arrived at

9

Mr. Diestel's vehicle a few seconds after Remington had pulled it over. Damron testified that Mr. Diestel was very calm and made no statements to the effect that he had "just apprehended a terrible person, I just shot Nero, go get Nero, [or] I've done you a great favor." *Id.* at 376. Damron described his interaction with Mr. Diestel as follows:

> I asked him why he's shot the guy out at the golf course and he stated that he had raped a girl and set some fires out in California. Then I asked him, I said, well, was it a girlfriend or what? And he said, yes. . . . I said, well, how did you meet him? He said that he had walked up to him and stated to him, "do you remember me?" And he said that's when the victim had [taken] off and started running and he started shooting at him. I asked him how far that he was when he started shooting at him, and he said, approximately 30 yards. He stated that the Sheriff in some county in California knew the victim and knew what kind of guy he was.

*Id.* at 377. Damron said that Mr. Diestel inquired about Casey's condition, asking, "[i]s he going to make it?" *Id.* The testimony continued:

> Q:    Did Mr. Diestel ever indicate to you his intent whether or not he meant to kill [Casey], wound him, do anything like that?
> A:    I had asked Mr. Diestel if he intended to kill him and he said, no, he intended to wound him. I said, you intended to wound him, and he said, yes, I intended to wound him. I didn't intend to kill him.
> Q:    At the time that he was making these statements to you, . . . did Mr. Diestel tell you that he ever told Doug Casey, halt, you're under arrest, stop, don't move, anything like that?
> A:    Mr. Diestel specifically stated to me that when he had first made contact with Mr. Casey he asked him, he said, "do you remember me?" And that's when Mr. Diestel stated to me that that's when Mr. Casey took off running.

*Id.* at 378. Damron added to the list of items in the car: one can of Body Guard,

10

pepper spray, clothes and toiletries, a fanny pack, a 15-foot rope, a 40-foot chain, a chain lock, and several books: *Nero, The End of the Dynasty*; *I'm Your Jesus of Mercy*; *Nero, Reality and Legend*; and *The Answer, The Holy Bible*. On cross-examination Damron added that Mr. Diestel did not seem scared. On redirect he stated that Mr. Diestel's condition changed as he received more information:

> Q:  The information he received that became available to him about the condition of Doug Casey, did his demeanor change?
> A:  Yes, it did.
> Q:  How so?
> A:  He was starting to ask more of how he was doing and it was like that everything was sinking in on what he had done.

*Id.* at 391. In his view, Mr. Diestel's mounting concern was more for himself than for the victim.

Chris Cisco, a state park ranger, had been directed to go to the scene of the arrest to assist by taking custody of Mr. Diestel and some evidence. He described Mr. Diestel as coherent: "[H]e knew who I was and where he was . . . and understood what I was telling him." *Id.* at 397. He was also "very calm and very polite and very cooperative." *Id.* After taking Mr. Diestel to the county jail, Cisco had the chance to observe him. Mr. Diestel did not mention Nero, and he seemed to understand who he was, where he was, and the purpose for his being in jail.

David Seals, a Special Agent for the Oklahoma State Bureau of Investigation, interviewed Mr. Diestel. He testified that he was "very lucid, very

clear-minded, deliberate in his actions, appropriately nervous." *Id.* at 407. He described various items taken from Mr. Diestel, including a list of phone numbers for golf pro shops and golf courses in the area. Like the other officers, he stated that Mr. Diestel did not mention Nero.

Carolyn Casey, the victim's mother, testified that she had met Mr. Diestel for the first time when he knocked on her door the day of the shooting. He asked about Doug Casey's whereabouts, and Ms. Casey asked why he wanted to know. He said he was "just an old friend passing through and wanted to look him up." *Id.* at 439. She described his behavior as follows:

> He was standing right at the door. He kept putting his hands either in his pockets or behind him. I don't remember exactly which it was. He kind of shuffled a little bit on the porch and he kept looking down. He wouldn't really look at me. He asked me then if Doug was at work and I told him I wasn't for sure, that it had been raining and I didn't know if he'd be at work or not. He said, at the golf course? I said, well, I don't know if he'd be on the course or in the maintenance area because the weather had been bad. Again, he asked me, he said, something about like—but he is at work, and I said, yes, in Durant.

*Id.* at 440. She asked again about his purpose, and he repeated his answer. But there was nothing alarming about his behavior. He mentioned only Casey, not Nero.

Ms. Casey testified that on reflection she had heard the name William James Diestel once before. The family had lived in Santa Paula, California, until Doug Casey was 20 or 21.

12

> When Doug was about 16 he had gotten into a fight . . . . He had been dating a girl and they'd been dating for over a year. Doug and I went to my grandmother's funeral in Missouri and were gone about a week or two. While we were gone she went out with this person a couple of times from what I understand. When we got back to California she told Doug about it and said that he was still bothering her and he wouldn't leave her alone. So Doug went to where he worked and confronted him.

*Id.* at 444–45. A fight ensued and the authorities got involved. The Caseys had the opportunity to press charges against Mr. Diestel but did not.

### b. Defense Witnesses

The defense called four lay witnesses, only three of whom gave testimony relevant to the issues on appeal. It also introduced five depositions, but these are not in the record on appeal and do not figure in the parties' briefs, so we assume that they are not material to the issues before us.

John Atwood, Mr. Diestel's older stepbrother, testified that he had a good relationship with Mr. Diestel. He stated that his brother was "a very emotional person," Supp. R. Vol. III at 480, who reacted very strongly to his father's death from cancer in 1992 and began reporting visits from angels—apparently his father and two other deceased relatives. At first, Atwood testified, Mr. Diestel said that the angels told him to care for a child, but they eventually came to tell him to stop an evil demon who was raping women and setting wildfires. He referred to the demon as "this guy in Santa Paula," *id.* at 482, and spoke of the rape of a girl he had once dated. Atwood said that Mr. Diestel spoke of these voices "numerous

13

times." *Id.* at 483.

Atwood repeatedly advised Mr. Diestel to seek professional help, but he was stubborn. He did, however, eventually get some treatment; he saw his ex-wife's father, a psychiatrist, who prescribed medication that appeared to help. He also saw another psychiatrist (a Dr. Templeton), but apparently only twice. During this time Mr. Diestel continued to work and was even promoted in his job.

After his divorce in the mid-1990s, Mr. Diestel became a heavy drinker. The drinking did not seem to affect his job performance, but over time the visions appeared to intensify, and he began speaking of them to family members other than Atwood. He also started to become more religious. He read the Bible and a book called *The Answer*, as well as books about Nero. He told Atwood of going to the authorities to report the causes of wildfires, rapes, and vandalism. From the summer of 2000 until the shooting in October, Mr. Diestel's condition seemed to worsen. Atwood said that

> he became more closed and seemed like he always was dwelling on
> something. He appeared to be always angry and he wasn't the happy
> person that I knew before that period. There was always periods of
> him seeming stressed, seeming angry and dwelling about something.
> I believe that was the Nero thing and the things that he was picking
> up from the books that he was reading.

*Id.* at 497.

That October there was a significant fire in Atwood's backyard caused by explosions of gasoline in the gardening shed. Atwood showed Mr. Diestel the

14

fire; Mr. Diestel seemed disturbed about it, but he did not talk about it directly. A few days later he left for Oklahoma.

After Mr. Diestel was arrested in Oklahoma, he called Atwood to ask him to call the President of the United States, who would pardon him. He did not explain why he would be pardoned. "I told him, are you serious? Do you really believe you're going to get pardoned? He said, yeah, call the President and find out that I'll be pardoned." *Id.* at 494. He repeated this statement in later phone calls.

Other than the shooting of Casey, Atwood could recall no violence by Mr. Diestel. He had heard of the earlier fight with Casey, but Mr. Diestel had said only that someone had punched him in the face over a girlfriend.

In 1994 or 1995 Mr. Diestel began talking about capturing the "guy from Santa Paula [who] was raping and starting fires and vandalizing" and taking him to the police. *Id.* at 499. Atwood "knew that it wasn't a good idea for [Mr. Diestel] to have a gun," *id.*, so he asked him if he had one. He did, and Atwood took it from him. About eight months later Atwood returned the gun because Mr. Diestel seemed better and claimed that he wanted to sell it, but Mr. Diestel simply traded it for another gun. When Atwood found out about this, he took the second gun away. Cross-examination elicited that Atwood had never reported to law-enforcement authorities Mr. Diestel's expressed intentions to stop the man who Mr. Diestel believed was setting fires, that Mr. Diestel sometimes

15

was drunk when he reported his hallucinations, and that Mr. Diestel had not told Atwood that he had acquired a third gun, the one with which he killed Casey.

Suzanne Diestel, Mr. Diestel's younger sister, testified that she did not believe that he was a violent person. She said that he began seeing angels about the time of their father's death. As she described it, Mr. Diestel's discussions of his hallucinations and obsessions progressed—first from concern with vandalism and graffiti, next with concern about a break-in of his sister's home, then to "fires and Nero and angels." *Id.* at 523. From 1994 to 1999 they worked at the same restaurant; during that period she worked full-time and he worked part-time. Ms. Diestel never heard her brother talk about his visions to others at the restaurant. In 1998 she suggested that he seek help, which he did. His father-in-law, a psychiatrist, prescribed Prozac, as did a second psychiatrist, Dr. Templeton. During this time "he was very withdrawn, he was very . . . out of it. I don't believe that he realized that he was crazy." *Id.* at 525.

According to Ms. Diestel, her brother quit taking medication and began drinking heavily at night in June 1999, continuing for about eight months, although it did not affect his work. (She insisted, however, that she had never known him to drink beer.) He then stopped drinking and smoking and started going to church. He also isolated himself from others, or at least from his sister. She recalled one occasion on which her husband took Mr. Diestel to target practice. Ms. Diestel said that Mr. Diestel once had a .22 pistol, which her

16

husband and Atwood had taken from him.

After the shooting, Mr. Diestel made similar requests of his sister as he had of Atwood—that she should call the President, and that Mel Gibson and the author of *Embraced by the Light* knew of his mission. She said that Mr. Diestel believed in his mission: "He was not wrong in his mind, he was not wrong, and there was no disproving him whatsoever." *Id.* at 536.

On cross-examination the state elicited that Mr. Diestel's relatives continued to allow him to help take care of the children of another sister, despite their concerns about Mr. Diestel's psychological state, and that apparently Mr. Diestel could refrain from talking about his hallucinations when he chose to. Ms. Diestel agreed that she had never heard him talk of them to people at work.

The State also elicited that Ms. Diestel, like Atwood, did not report any of her concerns about Mr. Diestel to the authorities, although the family had arranged for another sister to be committed because of mental illness:

> Q: Well, ma'am, with respect to your prior history, would you describe your brother's situation as being more extreme and more concerning than that of your sister?
> A: Well, my sister was kind of on the same wave length, you know, talking to herself and talking to, you know, people. Like she thought she was—it's different—my sister thought she was Cinderella.
> Q: So nothing concerning the apprehension of anyone, nothing taking down a demon of anyone, right?
> A: No.
> Q: Your sister never killed anyone, did she?
> A: No, sir.
> Q: Yet, you have her committed three separate times?

17

A:   Yes, sir.
Q:   But your concern was so great for your brother that you don't do anything over eight and a half years to do the same thing for him, do you, not one thing?
A:   Well, in California law it's very hard—
Q:   Ma'am, you don't know the law. Did you ever do anything to see that your brother got committed in . . . eight and a half years . . .?
A:   Dr. Templeton obviously did not.
Q:   Did you?
. . .
A:   No.

*Id.* at 564–66.

Finally, Ann Diestel, Mr. Diestel's mother, testified. She corroborated the other witness's characterizations of the progression of Mr. Diestel's mental illness. On May 7, 1999, she composed a letter to Dr. Templeton detailing concerns about Mr. Diestel's mental health. But on cross-examination she admitted that the concerns—except for his alcoholism—came from other family members, not from her direct observations of Mr. Diestel. And, like the rest of Mr. Diestel's family, she did not report her concerns to the authorities, nor did she report ongoing concerns to Dr. Templeton or seek to have Mr. Diestel committed. Also, she admitted that she had talked to him about his delusions and hallucinations relating to fires, gangs, and rapes only twice between 1992 and October 2000, once within six months of the killing and once several years earlier.

18

## 2. Expert Testimony

Mr. Diestel called two expert witnesses, Drs. Terese A. Hall and John R. Smith, regarding his state of mind at the time of the shooting. The state presented Dr. John Arnold Call in rebuttal.

### a. Dr. Hall

Dr. Hall, who had obtained a law degree and then a Ph.D. in clinical psychology, had a private practice in psychology and served part-time at Eastern State Hospital as a forensic psychologist. Because she had examined Mr. Diestel in her capacity as a state employee, she was not paid to testify.

She testified, based on interviews with Mr. Diestel and others and a review of Mr. Diestel's records, that Mr. Diestel was suffering from a severe mental illness, "[m]ost likely paranoid schizophrenia." Supp. R. Vol. IV at 14. Mr. Diestel told her during the examination that he had been charged with shooting someone; that "over the last 10 years . . . he had become convinced that this person was some kind of a demon named 'Nero' who had been setting fires and raping women and committing different acts of vandalism out in California." *Id.* at 13. He also said that he "had had visions of angels, and he believed just prior to this time he had a vision of Jesus himself directing him to go on a mission to cast down this demon, and that he traveled to Oklahoma for that purpose." *Id.* Mr. Diestel did not say precisely how he planned to "cast down" the demon, but he said that his goal was to "render him helpless," *id.* at 14, and that Jesus had

19

instructed him *not* to kill Casey.  He also said that he had been instructed to subdue Casey quickly "before President Clinton was out of office because President Clinton was going to pardon him."  *Id.*

Dr. Hall told the jury that paranoid schizophrenia is

> a very serious mental illness, probably the most serious, one of the most serious in any event.  It's characterized by being out of touch in reality in a variety of ways, most commonly through what we call "hallucinations," that means hearing things and seeing things that aren't really there, such as the voices he heard talking to him and the visions of angelic beings telling him things.  It's also characterized most prominently by delusions, that means false beliefs about reality that seem very real to the sick person, such as his belief that there was a demon named "Nero" committing all these acts.  I saw those symptoms and those are the hallmarks of schizophrenia.

*Id.* at 15.  She also stated that schizophrenia is a chronic, often lifelong illness; it is treated with medication, which is often but not always successful.

Dr. Hall further testified that there was no indication that Mr. Diestel was "malingering."  *Id.* at 16.  When asked whether "the person suffering from this illness [is] able to distinguish right from wrong," *id.*, Dr. Hall replied, "In areas in which the thinking is delusional and not based in reality their perceptions of right and wrong can be affected as well," *id.* at 17.  Pressed for a yes-or-no answer, Dr. Hall said, "I guess it would be it depends.  It wouldn't be a blanket across the board."  *Id.*  Asked if paranoid schizophrenia equated to "insanity" in a legal sense, Dr. Hall said, "You can't equate the two.  You have to ask what effect the illness had at that particular time on that particular action."  *Id.* at 18.  But when

20

asked whether she had "any reason to believe that on [the date of the murder] Diestel was not insane," *id.* at 19, she answered, "No, I don't." And she stated that someone who is "capable of making plans," who "understands instructions given to him," who is "very calm" and "quite coherent," and who has a "total recall later of what occurred," could "still be capable of suffering from paranoid schizophrenia." *Id.* at 20.

On cross-examination Dr. Hall said that she spent "less than three hours total" with Mr. Diestel, *id.* at 21, and she admitted that she had never made a determination of Mr. Diestel's sanity at the time of the killing. Cross-examination also established that most of her information on Mr. Diestel ultimately came from Mr. Diestel himself. And she agreed with the state that paranoid schizophrenia does not "in and of itself lend [sic] one to be insane." *Id.* at 25. Instead, such a determination "would depend upon the individual facts of the case" and "upon that person's actions, their words, their deeds, observations of others at or near the time when the real question of insanity comes in." *Id.*

### b.    Dr. Smith

The second defense expert, Dr. Smith, was a medical doctor specializing in psychiatry. He had served as an associate professor of psychiatry at the University of Oklahoma School of Medicine before entering private practice in 1970, while maintaining teaching positions at the medical school and the University of Oklahoma School of Law. He received a $2,000 fee from the

defense to review Mr. Diestel's records and to evaluate him, and an additional $1,500 to testify.

Dr. Smith interviewed Mr. Diestel for approximately three hours as part of a "comprehensive psychiatric evaluation." Supp. R. Vol. V at 6–7. In reaching a diagnosis of paranoid schizophrenia, which he called "pretty obvious," *id.* at 8, he also spoke with Mr. Diestel's mother by phone, reviewed a letter that she had written to a psychiatrist before the killing "describing her deep concern in the presence of clear delusional thinking," *id.*, and looked at "many other sources of information," *id.* Dr. Smith said that Mr. Diestel's account to him of the shooting was consistent with what "he's described in his police report." *Id.* at 9. He elaborated:

> [H]e had come to believe delusionally that Mr. Casey . . . had, in fact, become the spirit embodiment of Nero. He had been accumulating information for several years about fires in California, reading messages from graffiti and believing increasingly that Mr. Casey was the spirit of Nero and that he had to be captured and in some way brought down. It's not totally clear what he delusionally believed that consisted of, but it seemed to consist of some sort of exorcism or some sort of ridding him of demons. He believed that if this was not done that Nero and the body of Mr. Casey would bring some extreme destructiveness to the world and to him and to his family.

*Id.* Paranoid schizophrenia, Dr. Smith said, often involves delusions "focus[]ed around certain specific issues." *Id.* Mr. Diestel's delusions had "evolved over a long period of time" and had gotten "much worse in more recent times." *Id.* at 10. This, too, Dr. Smith added, is consistent with paranoid schizophrenia, which

22

"is a chronic disease that tends to evolve over a period of time" and typically comes "later in life." *Id.*

Dr. Smith said that Mr. Diestel also suffered from hallucinations in which he heard supernatural beings telling him that Casey was evil and a danger to the world. Mr. Diestel had "always indicated he did not intend to kill" Casey, but instead "strike him down, whatever that means." *Id.* at 26. Dr. Smith also testified that Mr. Diestel's ability to structure plans and to recall the events leading up to the killing were "not only consistent, but . . . ordinary" for a person suffering from paranoid schizophrenia. *Id.* at 14. The disease "does not interfere with organizational and cognitional abilities." *Id.* Indeed, many people with the disease often appear normal, he said, and can plan activities, hold a job, and so forth.

When asked whether Mr. Diestel "knew right from wrong" when he shot Casey, Dr. Smith replied as follows:

> Within the context—if you put yourself inside of Mr. Diestel's head, believing that you are saving the world and saving your family because an evil spirit has inhabited someone and that you have been dictated to exorci[z]e that evil spirit, then you can understand that he believed he was doing the right thing and did not have an ordinary man's concept of right and wrong in relationship, specifically, to Mr. Casey. So at that moment in time he could not distinguish because of a severe mental illness between right and wrong. He believed he was doing the right thing in relationship to the world and in relationship to his religious beliefs.

*Id.* at 16–17.

23

Asked whether there was "any possibility" that Mr. Diestel was malingering, Dr. Smith replied:

> He was not malingering. There are many issues that would confirm that. The best test of malingering is having an expert who knows the course of the illness, who knows rather what the patient is demonstrating in the interview, rather what the history has shown, what cor[oll]ary information that you have available shows, confirms your diagnosis. In this case he was very straightforward, very honest. He told me what he believed. He was in much better shape when he told me. He was beginning to doubt the delusions and beginning to doubt whether they were really true or not and he was no longer having hallucinations when I saw him. There is no question that he is not malingering.

*Id.* at 22.

On cross-examination Dr. Smith volunteered that he was "not a forensic psychiatrist in the sense of being Board Certified in forensic psychiatry." *Id.* at 28. He explained the difference between a forensic psychiatrist and a treating psychiatrist who provides therapy: "With an individual patient psychotherapy it's an on-going relationship usually. . . . You are certainly not as alert to issues like malingering, deception, things of that sort, which you're very aware of in a legal evaluation." *Id.* at 31. In contrast, "as a forensic psychiatrist you spend relatively short periods of time with a person and your focus is different. You want to establish competency, you want to establish the presence or absence of mental illness, things of that sort." *Id.* He acknowledged that it would ordinarily be unethical to be both the treating psychiatrist and the forensic psychiatrist for the same person.

24

The state questioned Dr. Smith about the information on which his opinion rested. Dr. Smith said that there was no need for him to interview Mr. Diestel more than once because "everything he had told me was perfectly consistent with all of the other reports that I read." *Id.* at 34. He also testified that what Mr. Diestel's mother had told him was based on "her direct observations of him over time in addition to things that he has told her." *Id.* at 35. The state then informed him that she had actually gotten her information from other people and asked:

> Q: So if it's important to your conclusions that she observed the information that's in the letter and she didn't actually observe that, you may have to re-think your conclusions, won't you?

*Id.* at 36. He responded:

> A: No, I won't for several reasons. One, is because what she described there is perfectly consistent with everything else I know about him. Also, her source of information about what was going on with him has been confirmed by other people who knew him, including his ex-wife. If that's where she got the information it's confirmed by her and it is so consistent, in fact, with the information that's been supplied by everyone else that she had correct information wherever she got it.

*Id.* When the state suggested that Mr. Diestel was really the source of all the information about his illness, Dr. Smith responded:

> It comes from Bill Diestel and other people who observed him and it comes from observable information in the terms of collecting things about the fires, which fits with his delusions, from looking at the books he was carrying, which fits with his delusions, so that when you put it all together it's absolutely confirmatory of what he said.

25

*Id.* at 38. Dr. Smith admitted, however, that he could not determine with certainty whether Mr. Diestel had been hallucinating, because "he was not hallucinating at the time I saw him and he told me he was not." *Id.* at 64.

In the same vein, the state questioned Dr. Smith about the last paragraph of his five-page written report. It stated:

> There is still a good deal of information which I have not reviewed. This is a preliminary report. Any additional information I develop from reading numerous interviews will be included at a later date. I feel quite confident in my conclusions at this time and expect that the additional information will be confirmatory.

*Id.* at 56 (internal quotation marks omitted). Dr. Smith testified that the only new information he received that was "anything but just confirmatory" of his report, *id.* at 55, was that police interviews with Mr. Diestel had elicited that he had owned a gun before purchasing the one used to shoot Casey (whereas the report, which is not in the record, evidently indicated that he had not previously owned a gun). Accordingly, Dr. Smith said, he "didn't add any or submit any additional reports because it was all so confirmatory of what I already knew and had already reported that I simply didn't do anymore [sic] reporting." *Id.* at 56.

The state elicited, however, that the report contradicted the trial evidence in three other respects. First, the report stated, contrary to the eyewitness testimony, "At the time of the arrest it was obvious that [Mr. Diestel] was severely disturbed." *Id.* at 68 (internal quotation marks omitted). Second, the report said, again contrary to eyewitness testimony, that Mr. Diestel had not drunk alcohol for

26

several months before the shooting.  Third, Dr. Smith acknowledged that the testimony that a member of Mr. Diestel's family had taken him to a shooting range was contrary to his assumptions.  Dr. Smith further acknowledged that although the police reports mentioned the books about Nero found in Mr. Diestel's car, there was no indication that Mr. Diestel had referred to Nero from the time he left California until the time Dr. Smith interviewed him on January 31, 2001, more than three months after the killing.

The state also questioned Dr. Smith about his conclusion that Mr. Diestel suffered from paranoid schizophrenia.  It examined the meaning of this diagnosis:

> Q:  Now, is it your opinion, Doctor, that at the time Bill Diestel shot Doug Casey that Bill Diestel knew that he was Bill Diestel?
> A:  Yes, he knew he was Bill Diestel.
> Q:  Did he know that Doug Casey was Doug Casey?
> A:  He did not know—he knew he was the body of Doug Casey, but he thought he was shooting the spirit of Nero.
> Q:  But he knew he was shooting a body that he identified as Doug Casey?
> A:  Yes.  Otherwise, he couldn't have found him on the internet.
> . . .
> Q:  That at that time he knew he was shooting a handgun?
> A:  Yes, he told me he had a gun in his hand.
> Q:  He didn't think he was working the video clicker and he was just going to turn Doug Casey's volume down?
> A:  No.
> Q:  Nothing like that?
> A:  No.
> Q:  He knew it was a handgun?
> A:  He knew it was a gun.
> Q:  And he knew that handguns shoot bullets out of them?

A: He obviously did because he shot at him with the intention of crippling him.

Q: He told you he intended to shoot him?

A: Nero.

Q: And he knew that when bullets strike a human being they cause damage?

A: I didn't ask him that specifically, but he knew he could cripple him.

Q: You didn't ask that. He knew that Doug Casey was a human being?

A: Yes, he knew—well, he thought he was the spirit of Nero. He knew the body was Doug Casey.

Q: But if he wanted to exorci[z]e this demon that inhabited Doug Casey—

A: He had to capture Doug Casey.

Q: The only way a spirit could inhabit a body is if it's a human body?

A: I assume so.

Q: He didn't tell you that Doug Casey was, in fact, Nero?

A: He told Dr. Hall something along that line.

Q: But he didn't tell you that?

A: He told me that he felt that Nero—that Doug Casey was Nero, that he had to capture him and in some way talk him out of it.

Q: Let's put it down to this, he didn't believe in his mind that Doug Casey was a rabid 200-pound wolf who was attacking him and he had to protect himself, nothing like that?

A: No, no, he did not.

Q: He knew—

A: I guess he thought he was a beast, but he was running away from him and not toward him.

*Id.* at 61–63.

On redirect examination Dr. Smith said that there was nothing inconsistent between Mr. Diestel's not having proclaimed after the shooting that he had just killed Nero and Mr. Diestel's believing that he had done so. Also, he repeated that at the time of the shooting Mr. Diestel "thought he was right" and could not

28

distinguish right from wrong. *Id.* at 73.

### c. Dr. Call

The state's expert, Dr. Call, was the only board-certified forensic psychologist in Oklahoma. He had a Ph.D. in clinical psychology and a law degree. He was paid $150 an hour by the state to evaluate Mr. Diestel and to testify.

Dr. Call reviewed records and interviewed Mr. Diestel, seven law-enforcement officers, and an eyewitness to the shooting. He testified that

> [i]t is crucial that a Forensic Psychologist in performing an evaluation of an individual's mental state at the time of a crime to interview individuals who saw the individual at the time of the crime, shortly before or after and/or during, if at all possible, so that one can utilize that data and that information to make a determination as best one can what their mental state was.

Supp. R. Vol. VI at 6–7. Dr. Call stated that even if one suffers from delusions—that is, false beliefs—he might still know whether something is wrong. Moreover:

> Q:     In order to make a determination of whether someone was suffering from a delusion of mistaken belief or anything like that, it is important that we look at the individual facts present at or near the time the act of which we're complaining of occurred?
> A:     Yes.

*Id.* at 8.

Dr. Call observed that Mr. Diestel made no statements to suggest that he was operating under color of law; for instance, his thinking was different from

29

those who "delusionally think that an individual needs to be killed and they believe that they have a warrant for that." *Id.* Rather, he said, Mr. Diestel made statements to him that would "indicate that he knew, understood and appreciated what he did out there that day." *Id.* at 9. In particular, "he indicated that—in our conversations that he knew he was shooting a human being who was a citizen of the United States and he knew that he was operating a handgun and that he knew that he had, in fact, shot the victim." *Id.*

Similarly, Dr. Call testified that Mr. Diestel's inquiries about Casey's condition and his statement that he did not intend to kill him indicated that Mr. Diestel "understood and appreciated" the act. *Id.* at 10. Furthermore, "[h]e indicated to me that he knew that Doug Casey was the person that he was shooting." *Id.* The testimony continued as follows:

> Q:    During the course of your interview and evaluation, was he clear in his understanding that not only was he shooting Doug Casey but that Doug Casey had certain rights and privileges?
> A:    Yes. He indicated that he had the realization that, you know, Doug Casey was a human being and a citizen. He also felt that, like I say, I explored this with him and he also believed that Doug Casey was the reincarnation of a Roman emperor. I was interested in this in particular. It's not that he felt that there was a spirit of a Roman emperor inside of Doug Casey, but that Doug Casey was a human being who just happened to also be the reincarnation of Nero.

*Id.*

Dr. Call agreed that Mr. Diestel "might have been suffering from paranoid schizophrenia" when he killed Casey, but that it is "possible for someone

30

suffering from a psychos[i]s such as paranoid schizophrenia to do an act, in this case a criminal act, and know that it was wrong." *Id.* at 11.

On cross-examination Dr. Call stated that he had spent two to three hours with Mr. Diestel. His evaluation report had concluded that "the bulk of the data indicates that on the day of the homicide Mr. Diestel could be diagnosed as suffering from paranoid schizophrenia." *Id.* at 15 (quoting report). The testimony continued:

> Q: If the delusions and hallucinations were directing [Mr. Diestel] . . . on the day that he committed this crime, would he then have been able to discern or differentiate between right and wrong on that day?
>
> A: The answer to that question is yes possibly and no possibly. It is possible for an individual to have a command hallucination or command delusion and to not know if it's—
>
> . . .
>
> Q: Would you explain that for the jury? Does that mean that they're commanded to do a certain thing?
>
> A: For example, a situation like a command hallucination, let's say, you hallucinate a figure, a person or object, and that figure tells you to do something, like kill this person.
>
> Q: Or to strike down this person or whatever the terminology might be, right, to cast him down?
>
> A: To cast him down, whatever, but they're commanding you to do something. Now, on the one hand it is possible that the individual could know that doing that is wrong. I've had cases where that's true. It's also where they might not believe that it's wrong. . . .
> If they have a command hallucination they're being directed, but they could know on the one hand that the direction is wrong and that the action is wrong and against the law. On the other hand, in a certain circumstance they might know and they might come to the conclusion that, no, it's not wrong. If I do this this is the right thing to do. For example, if they're doing it under the color of law. Like maybe they have a

31

command hallucination of a President saying, here's a warrant, go out and kill this person, execute them because you have a warrant from the President of the United States to do so.

Q:     Or that someone was the reincarnation of Nero, the Devil, and he was being directed to go and strike this evil person down, wouldn't that be one example?

A:     No.  It could be, but then it might not be.  It depends on what the individual actually thinks when they're doing that.  The best way since we can't read minds, the way we figure that out is how they actually commit the crime, what they do beforehand, during and after.

*Id.* at 20–22.  Dr. Call also admitted that Mr. Diestel told him of delusions and hallucinations and that such reports were "consistent with other information that he believed that he had this delusion that the individual and the victim was Nero and a bad person and that he needed to do something to this fellow."  *Id.* at 30. But he declined to state an opinion on whether Mr. Diestel was legally sane or not:

Q:     Now, I'm going to ask you [about] your final determination about Mr. Diestel's mental state on the day he . . . shot and killed Mr. Casey, and ask you, if . . . you don't conclude that he was able to discern or differentiate between right and wrong, do you?

A:     No.  That's the ultimate legal issue, also known as the "verdict," which a jury decides and not a psychologist or psychiatrist.

Q:     But you don't say anything about whether he knew or could have known that what he was doing was not right?

A:     Well, if I understand you correctly, he knew that Mr. Casey did not want to be shot, he knew that he was shooting Mr. Casey, he knew that Mr. Casey was a flesh and blood human being, an American citizen. . . .  That he also believed that Mr. Diestel was an evil man, the Roman Emperor Nero reincarnated, a man who raped a woman and who set fires in California. . . .  It also indicates that Mr. Diestel was obsessed

32

> with the victim and carried a grudge against Mr. Casey in part because he assaulted him years earlier. And the bulk of the data indicates that on the date of the homicide Mr. Diestel could be diagnosed as suffering from paranoid schizophrenia.
>
> Q:    So you expressed no opinion whether Mr. Diestel knew the difference between right and wrong on the day that he committed this crime?
>
> A:    That's correct. I don't have an opinion because that's the verdict.

*Id.* at 31–32.

On redirect examination Dr. Call clarified the distinction between a medical diagnosis and a legal conclusion: "paranoid schizophrenia and insanity [are] two different issues." *Id.* at 34. A finding of paranoid schizophrenia, he emphasized, does not determine the ultimate legal question of whether Mr. Diestel could distinguish right from wrong. He added that revenge is a common "primary" motive for homicide and that Mr. Diestel "made comments about Casey which indicates to me that he was vengeful." *Id.* And he declined to conclude that Mr. Diestel was "compelled" to kill Casey, *id.* at 35, distinguishing hallucinations and delusions from such compulsions. He further stated that "in my experience, if an individual with paranoid schizophrenia kills somebody and believes that they have done a good thing they will say that." *Id.* He saw no evidence that Mr. Diestel had sought praise. He reiterated that it is possible for a sufferer of paranoid schizophrenia to commit an act and still know that it is wrong.

## C.    State-Court Appeal

Mr. Diestel was convicted at trial and appealed to the OCCA on May 16,

2002. It affirmed the conviction in an unpublished opinion, with one judge dissenting. The court held that the state had presented substantial evidence that the killing had been for revenge. It recognized that "[t]he experts in this case were consistent in their diagnosis that [Mr. Diestel] suffered from paranoid schizophrenia." OCCA Op. at 10. (Citations to the OCCA opinion, Aplee. App. at 42–56, will refer to the page numbers of the opinion rather than those of the appendix.) "However," it added, "evidence of a mental disability alone is not sufficient to establish insanity at the time of the offense. Testimony in this case established that paranoid schizophrenia cannot be equated with insanity." OCCA Op. at 10 (citation omitted).

In particular, the court characterized Dr. Call's testimony as stating that Mr. Diestel's illness "did not preclude him from knowing that shooting the victim was wrong" and that "the best way to determine whether a person was sane, as in he was aware that the commission of an act was wrong, was to look at what the person did before, during, and after the crime." *Id.* at 7. It observed that when the police apprehended Mr. Diestel, "he never mentioned Nero or made any reference to his delusions," and it noted Dr. Call's testimony that if Mr. Diestel "had truly believed he had done a good thing by shooting the victim, he would have said so." *Id.* The court concluded:

> The issue [is] whether [Mr. Diestel's] mental disability so impaired his judgment that, at the time he killed the victim, he was incapable of appreciating the nature and consequences of his acts or

34

knowing right from wrong. A review of [his] actions, prior to, during, and after the crime, shows that he knew right from wrong and was sane at the time of the crime. [He] apparently only told family members about his delusions and hallucinations. Co-workers in California had never heard those claims, and in fact testified that [he] was a good employee with nothing in his demeanor to indicate he was having any mental problems. [He] left California specifically to travel to Oklahoma and find the victim. He obtained a list of golf courses in order to determine where the victim worked. [He] purposefully deceived the victim's mother in order to locate the victim.

After the shooting, [Mr. Diestel] claimed he intended only to capture the victim and take him prisoner. If that were truly [his] intent, he did not take advantage of the numerous opportunities to do so—in the restaurant, in the parking lot. However, instead of taking him prisoner, [he] shot the victim—not in the legs or the butt as he claimed was his intent, but in the back of the neck as the victim was running away. These actions support an inference that they were committed with the intent to kill the victim.

Again, after the shooting, there was no attempt to take the victim prisoner as he had collapsed behind the maintenance building out of [Mr. Diestel's] view. [Mr. Diestel] merely left the scene, and did so in a calm manner. When it became apparent that the authorities were on to him, [he] pulled his pickup over and exited it before the officer could even get his car stopped. Testimony from the arresting officers established that [he] admitted shooting the victim and seemed to have no trouble understanding what was occurring. This behavior illustrates that [he] was aware that his shooting of the victim was wrong.

Further, [his] stories about Nero and the evil demon did not surface until sometime after the crime when he was interviewed by the medical experts. [He] never said anything about the evil demon to the arresting officers. [His] attempts to create an excuse that he merely intended to capture the victim and not kill him supports an inference that he understood that his actions were wrong.

After a thorough review of the evidence presented by both parties, we find [Mr. Diestel] did not meet his burden of raising a reasonable doubt as to his sanity at the time of the crime. The evidence clearly supports the jury's determination that [he] was sane beyond a reasonable doubt at the time he killed the victim.

35

*Id.* at 10–12.

The OCCA also rejected Mr. Diestel's argument that the jury should have been instructed on the consequences of a not-guilty-by-reason-of-insanity verdict, holding that Oklahoma law did not require such an instruction.

## II.    SUFFICIENCY OF THE EVIDENCE

Evidence of guilt is sufficient if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Dockins v. Hines*, 374 F.3d 935, 939 (10th Cir. 2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  But the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) "adds an additional degree of deference to state courts' resolution of sufficiency of the evidence questions." *Patton v. Mullin*, 425 F.3d 788, 796 (10th Cir. 2005).  AEDPA provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  Because "[s]ufficiency of the evidence is a mixed question of law and fact[, w]e ask whether the facts are correct and whether the law was

36

properly applied to the facts, which is why we apply both 28 U.S.C. § 2254(d)(1) and (d)(2) when reviewing sufficiency of the evidence on habeas." *Maynard v. Boone*, 468 F.3d 665, 673 (10th Cir. 2006). "[T]he question before us is whether the OCCA's conclusion that the evidence was sufficient constituted an unreasonable application of the *Jackson* standard." *Patton*, 425 F.3d at 796.

Whether the evidence is sufficient depends, of course, on what the state is required to prove. *See Jackson*, 443 U.S. at 324 n.16 ("[T]he standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law. Whether the State could constitutionally make the conduct at issue criminal at all is, of course, a distinct question."). Under Oklahoma law the defendant bears "the burden of raising a reasonable doubt of his sanity at the time of the crime." OCCA Op. at 4 (internal quotation marks omitted). If that burden is met, "it is incumbent upon the State to prove beyond a reasonable doubt that the defendant could distinguish between right and wrong at the time of the offense." *Id.* at 4–5 (internal quotation marks omitted).

The final paragraph of the OCCA's analysis of the sufficiency of the evidence in this case is somewhat troubling. The court wrote**:**

> After a thorough review of the evidence presented by both parties, we find [Mr. Diestel] did not meet his burden of raising a reasonable doubt as to his sanity at the time of the crime. The evidence clearly supports the jury's determination that [he] was sane beyond a reasonable doubt at the time he killed the victim.

*Id.* at 12. We do not agree with the first sentence insofar as it could be read to

37

say that Mr. Diestel failed to satisfy his burden of presenting sufficient evidence for a reasonable juror to harbor a reasonable doubt. But even if the statement in that sentence is incorrect,[1] the next sentence—that the evidence supports a finding of sanity beyond a reasonable doubt—correctly addresses the dispositive issue (the sufficiency of the state's evidence). Therefore, we must grant AEDPA deference to the OCCA's ruling in that sentence.

The thrust of Mr. Diestel's insufficient-evidence argument is that a defense expert, Dr. Smith, unequivocally testified that Mr. Diestel could not distinguish right from wrong when he killed Casey and that no other evidence at trial could dissipate the reasonable doubt created by that testimony. To evaluate this argument, we must examine the role of expert opinions regarding insanity in criminal trials.

The general rule is that juries are not bound to believe opinions of witnesses, even if they are qualified as experts. *See United States v. Oliver*, 278 F.3d 1035, 1043 (10th Cir. 2001) ("[I]t is solely within the province of the jury, to weigh . . . expert testimony." (internal quotation marks omitted)); Tenth Circuit Pattern Criminal Jury Instructions § 1.17 (2005) ("A witness who has knowledge, skill, experience, training or education, may testify and state an opinion concerning such matters. You are not required to accept such an opinion. You

---

[1]Perhaps the OCCA meant to say only that the evidence did not persuade the jury to have a reasonable doubt; but we need not resolve that matter.

38

should consider opinion testimony just as you consider other testimony in this trial."); Oklahoma Uniform Jury Instructions–Criminal § 9–42 ("Testimony has been introduced of certain witnesses who purport to be skilled in their line of endeavor or who possess peculiar knowledge . . . . You may consider the testimony of these witnesses, and give it such weight and value as you think it should have, but the weight and value to be given their testimony is for you to determine."). Indeed, a jury instruction appears to have advised the jurors in this case that they need not believe experts; in final argument the state said to the jury: "While we're on the subject of doctors, remember Instruction 3. You don't have to just accept what they say just because they've got credentials. You don't check your common sense at the door." Supp. R. Vol. VII at 630–31. (Instruction 3 is not in the record.)

This general rule applies to psychiatric testimony. Under Oklahoma law, "[a] jury can disregard entirely the testimony of psychiatric or medical experts and find sanity from testimony of lay witnesses alone." *McGregor v. State*, 885 P.2d 1366, 1376 (Okla. Crim. App. 1994). Our own cases have repeatedly held that juries need not be swayed by expert psychiatric testimony, regardless of disparities in the number or thoroughness of experts on either side of a case. For example, in *United States v. Madrid*, 673 F.2d 1114 (10th Cir. 1982), we affirmed a conviction for robbery even though "four of the five experts who expressed opinions on the issue of sanity concluded that [the defendant] was not capable of

39

conforming his conduct to the requirements of the law at the time of the robbery" and "defense experts examined defendant numerous times over different periods of several months," whereas the state's expert did not examine the defendant "until he had been institutionalized and treated for about one year after the robbery, and his second examination was over 13 months after the offense, " *Id.* at 1123. We held that "the jury could justifiably have found beyond a reasonable doubt that Madrid was competent at the time of the robbery," *id.*, based on the testimony of eyewitnesses to the crime, another lay witness who observed him planning the crime, and a state expert who did not believe that the defendant was schizophrenic.[2]

Similarly, in *United States v. Walker*, 524 F.2d 1125 (10th Cir. 1975), the defense expert had spent more than five hours with the defendant and heard all the evidence at trial, whereas the state's expert had spent only an hour with the defendant and did not hear other testimony at trial. Yet we rejected the defendant's argument that "more weight should be given to [the defense expert's] testimony because he studied [the defendant's] mental condition in greater depth."

---

[2]Before 1984,"if a federal defendant introduced sufficient evidence to raise a reasonable doubt as to his sanity, it was sufficient to create a question for the jury on which the Government bore the ultimate burden of persuasion beyond a reasonable doubt." *Dixon v. United States*, 126 S. Ct. 2437, 2444 (2006). In 1984, however, Congress changed this burden, "requiring a defendant to prove his insanity by clear and convincing evidence, 98 Stat. 2057, codified at 18 U.S.C. § 17(b)." *Id.* at 2445.

*Id.* at 1128–29. We explained that "the credibility and weight to be given the testimony is not a question for an appellate court; that is for the trier of fact." *Id.* at 1129.

And in *United States v. Coleman*, 501 F.2d 342 (10th Cir. 1974), we upheld a conviction of air piracy even though the only expert witness to testify regarding sanity was for the defense. We said, "The credibility and weight of expert testimony are matters within the jury's province and need not be accepted as conclusive even though uncontradicted by counter-medical expertise." *Id.* at 346; *see also Valdez v. Ward*, 219 F.3d 1222, 1238 (10th Cir. 2000) ("Despite the relative strengths of the expert testimony, only the fact-finder may determine whether the defendant was legally sane.").

Moreover, we should not overemphasize that one expert, as opposed to the others, expressed an opinion on the ultimate issue of sanity. Indeed, in federal court the rules of evidence preclude an expert witness from offering an opinion that a defendant could or could not distinguish the difference between right and wrong. Fed R. Evid. 704(b) states:

> No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or a defense thereto. Such ultimate issues are matters for the trier of fact alone.

As we have noted:

> The rule prevents a confusing "battle of the experts" and preserves the decision on the ultimate issue of state of mind for the jury, rather than leaving it in the hands of retained experts. The rule promotes reliability by preventing testimony on the legal connotations of a medical diagnosis, a role the American Psychiatric Association admits that psychiatrists are not qualified to fill.

*United States v. Austin*, 981 F.2d 1163, 1166 (10th Cir. 1992); *see also United States v. Wood*, 207 F.3d 1222, 1236 (10th Cir. 2000) (Rule 704(b) is intended to prevent "intrusion[s] into the province of the jury"). Another court has similarly written:

> The at least theoretical effect of Rule 704(b) is to make it possible for juries to find a defendant not guilty by reason of insanity even if no expert would draw that same conclusion. Conversely, the rule also permits juries to find a defendant sane and guilty even if every expert would opine that the defendant was insane. The purpose of Rule 704(b) is to have jurors decide whether the defendant was sane or not without being told what conclusion an expert might draw.

*United States v. West*, 962 F.2d 1243, 1247 (7th Cir. 1992). Rule 704(b) did not, of course, apply in Mr. Diestel's state-court trial. But when assessing the reasonableness of the verdict, it is worth noting that the evidence on which Mr. Diestel most relies would not even have been admissible in a federal trial.

Turning to this case, there was considerable testimony from which the jury could reject Dr. Smith's opinion and find that Mr. Diestel knew the difference between right and wrong at the time of the killing. First, although all three experts agreed that Mr. Diestel had paranoid schizophrenia, the jury had reason to doubt the severity of the disorder. Mr. Diestel's mother, who expressed grave

42

concern about her son, said he spoke to her of his delusions relating to wildfires, gangs, and rapes only twice during an eight-year period. Mr. Diestel apparently never spoke of these stories outside his family. And, most tellingly, the sister and stepbrother to whom he allegedly spoke about these matters most frequently never sought to commit him even though they had committed his sister three times.

The jury also could have questioned Dr. Smith's testimony. He was not, like the state's expert, board certified for forensic work. And the jury could have viewed him as pursuing an agenda because of his unwillingness to adjust his conclusions in light of evidence contrary to his original understanding of the facts—such as Mr. Diestel's gun ownership, his use of alcohol, and his demeanor on the day of the killing.

In addition, Dr. Smith's expert testimony did not stand unqualified or uncontradicted by other experts. Dr. Hall, the other witness for Mr. Diestel, testified that those who suffer from paranoid schizophrenia may still be able to tell right from wrong and may be legally sane. Dr. Call, the only board-certified forensic psychologist in Oklahoma, said the same. Dr. Call further testified that if Mr. Diestel had thought that he had done the right thing, he would have said so, but those who arrested him testified that he did not brag or seek praise for his actions. To be sure, Dr. Call never said that Mr. Diestel was sane, stating instead that it would be inappropriate for him to offer his opinion on the issue. But the jury could have been persuaded by Dr. Call's respect for his limited role and the

43

suggestion that Dr. Smith had been unprofessional.

Furthermore, the events on the day Casey was killed, as reported by lay witnesses, could be seen as inconsistent with Mr. Diestel's defense. *See Madrid*, 673 F.2d at 1123 (expert's testimony, coupled with that of lay witnesses who observed the defendant at the scene of the robbery and "planning the robbery in advance," was sufficient for a jury to find guilt beyond a reasonable doubt). Eyewitnesses testified that Mr. Diestel seemed calm and deliberate. (The experts testified that Mr. Diestel's schizophrenia did not necessarily prevent him from implementing complex plans, but the jury was entitled to draw its own conclusions from Mr. Diestel's behavior.) More importantly, Mr. Diestel's actions appear inconsistent with his alleged plan to stop a demon. He had an opportunity to capture or confront Casey before he shot him in the parking lot, yet he took no action. When he finally approached Casey, he said nothing of Nero; instead, he said "[D]o you remember me?" Supp. R. Vol. II at 303. He shot Casey in the neck, not in the legs. After the shooting he still failed to apprehend Casey; he just drove away. And when he was arrested, he said nothing of Nero or demons. Apparently there was no testimony or other evidence of his speaking of Nero from the time he left California until his interview with Dr. Smith three months later.

We emphasize that the lay witnesses were not testifying to their opinions of Mr. Diestel's sanity, but were providing observations from which others (the

44

experts and the jury) could draw inferences.  To be sure, lay witnesses *alone* may be insufficient in some cases to rebut a particularly strong insanity defense.  *See McKenzie v. United States*, 266 F.2d 524, 525–26 (10th Cir. 1959) (lay witnesses' observations of defendants' behavior, before and after the crime, were insufficient to rebut a defense that marshaled seven physicians and psychologists and "Selective Service records . . . which showed that the defendant had been rejected for military service . . . because of paranoid psychosis, and other reasons").  But the general rule is that lay testimony can suffice.  *See, e.g.*, *Coleman*, 501 F.2d 342.  Moreover, the state did not rely on lay witnesses alone.  It called Dr. Call to give expert guidance to the jury; and both he and Dr. Hall (a defense witness) testified that a determination regarding sanity would depend on the defendant's words and behavior at the time of the offense.  We note that the state may satisfy its burden merely by undermining the defense's evidence.  *See United States v. McGraw*, 515 F.2d 758, 760 (9th Cir. 1975) ("Once the defendant has introduced sufficient expert testimony to support a reasonable doubt as to sanity, the government must:  (1) introduce its own expert testimony in rebuttal; *or* (2) discredit the defendant's expert testimony on cross-examination; *or* (3) rely upon evidence from which the jury may infer that the defendant's expert testimony depends upon an incorrect view of the facts." (emphasis added)).

On appeal Mr. Diestel relies principally on *Kiser v. Boone*, 4 F. App'x 736, 742 (10th Cir. 2001), an unpublished decision in which we determined that there

was insufficient evidence of sanity when the state's "rebuttal" of the defendant's experts' "overwhelming" testimony amounted to (1) a psychiatrist who offered "rambling" testimony, *id.* at 740 n.3, with "little professional credibility," *id.* at 741, and who had not evaluated the defendant to determine his mental state at the time of the shooting, *id.*; (2) a neighbor of the victim who testified that the defendant appeared "nice" and "polite" when asking where the victim lived, *id.* (internal quotation marks omitted); and (3) a friend of the victim who reported that the victim was afraid because of a threatening phone call that he had received from the defendant, *id.* Of course, *Kiser* is not a binding precedent, and we express no opinion on whether its reasoning is persuasive. But in any event it is distinguishable in several respects. For example, unlike the state's expert in *Kiser*, Dr. Call focused on Mr. Diestel's state of mind at the time of the offense and provided the jury with a framework to use the lay testimony in reaching its conclusion regarding sanity.

Perhaps the real difficulty in Mr. Diestel's case is in defining what it means to know the difference between right and wrong. We do not say that a person cannot distinguish between right and wrong simply because he believed that the victim had done terrible things and therefore decided that the world would be better off without the victim. Every assassin presumably has such a belief, but not all assassins are legally insane. The insanity defense is limited to certain types of delusions. If the killer's mental illness caused him to believe that he had

46

a warrant from the President or a command from God to kill the victim, he did not believe his deed was "wrong" and the insanity defense is available. Or if his mental illness caused him to believe that the victim was not a human being but an embodied evil spirit, he did not know the nature of his deed (the murder of a human being) and likewise has the defense. But a mentally ill person who decided to kill the victim because of the victim's imagined misdeeds may well have understood that the law and common morality do not permit one person to kill another for that misconduct; and such a person would not be legally insane.

This point was recognized at the very outset of the adoption of the M'Naghten test. The test is generally formulated, as in Oklahoma, as having two components. The defendant was legally insane when the act was committed if "he was suffering from a mental disease or defect rendering him [1] unable to differentiate between right and wrong, or [2] unable to understand the nature and consequences of his act." *Pugh*, 781 P.2d at 844. This proposition is a paraphrase of the Law Lords' answer in M'Naghten's Case, 8 Eng. Rep. 718 (1843), to two of five hypothetical questions (the second and third) posed by the House of Lords about the insanity defense (apparently because of concerns about the insanity acquittal of Daniel M'Naghten). The answers to the first and fourth questions, however, address the point of concern here. The first question was:

> What is the law respecting alleged crimes committed by persons afflicted with insane delusion in respect of one or more particular subjects or persons: as, for instance, where, at the time of the

47

commission of the alleged crime, the accused knew he was acting contrary to law, but did the act complained of with a view, under the influence of insane delusion, of redressing or revenging some supposed grievance or injury, or of producing some supposed public benefit?

*Id*. at 722 (internal quotation marks omitted).  The answer was:

[A]ssuming that your Lordships' inquiries are confined to those persons who labour under such partial delusions only, and are not in other respects insane, we are of opinion that, notwithstanding the party accused did the act complained of with a view, under the influence of insane delusion, of redressing or revenging some supposed grievance or injury, or of producing some public benefit, he is nevertheless punishable according to the nature of the crime committed, if he knew at the time of committing such crime that he was acting contrary to law; by which expression we understand your Lordships to mean the law of the land.

*Id*.

The fourth question was:  "'If a person under an insane delusion as to existing facts, commits an offence in consequence thereof, is he thereby excused?'" *Id*. at 723.  The answer was consistent with the first answer:

[T]he answer must of course depend on the nature of the delusion: but, making the same assumption as we did before, namely, that he labours under such partial delusion only, and is not in other respects insane, we think he must be considered in the same situation as to responsibility as if the facts with respect to which the delusion exists were real.  For example, if under the influence of his delusion he supposes another man to be in the act of attempting to take away his life, and he kills that man, as he supposes, in self-defence, he would be exempt from punishment.  If his delusion was that the deceased had inflicted a serious injury to his character and fortune, and he killed him in revenge for such supposed injury, he would be liable to punishment.

*Id*.

48

Judge Cardozo, in the famous case of *People v. Schmidt*, 110 N.E. 945 (1915), addressed the concern that the answer to the first question was inconsistent with the M'Naghten test expressed in the answers to the second and third questions. He found them compatible:

> The answer to the first question, though it seems to make the knowledge of the law a test, presupposes the offender's capacity to understand that violation of the law is wrong. It applies only to persons who "are not in other respects insane." We must interpret the answer in the light of the assumptions of the question. A delusion that some supposed grievance or injury will be redressed, or some public benefit attained, has no such effect in obscuring moral distinctions as a delusion that God himself has issued a command. The one delusion is consistent with knowledge that the act is a moral wrong, the other is not. . . . The real point of the inquiry was whether a defendant, who knew that the act was wrong, was excused because he had an insane belief that either personal or public good would be promoted by the deed. There was no thought of any conflict between the commands of law and morals.

*Id*. at 948. The one gloss added by Judge Cardozo to the Law Lords' answers is that one who knew that commission of the act was unlawful could still have been legally insane if he believed that the act was not contrary to common morality because, say, he thought that God had commanded it.

The views expressed by the Law Lords and Judge Cardozo are not mere ancient lore. The Model Penal Code (the MPC) appears consistent with those views. MPC § 4.01(1) states: "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his

49

conduct or to conform his conduct to the requirements of law." The brackets around *wrongfulness* reflect that the Code presents two alternative formulations of the appreciation-of-right-or-wrong test. The defendant may "lack[] substantial capacity . . . to appreciate the *criminality* . . . of his conduct" or "lack[] substantial capacity . . . to appreciate the . . . *wrongfulness* of his conduct." *Id*. (emphasis added and brackets omitted). Of course, if the "criminality" formulation is adopted, one would not be entitled to the insanity defense merely because delusions caused him to believe that the victim had committed such horrible crimes as to be deserving of death. Even if the defendant thought that the world would be a better place without the victim, the defendant would be entitled to the defense only if he also believed that killing the victim would not violate the law.

Less obviously, but just as true, the "wrongfulness" formulation, which accords with Oklahoma law, would also not be available to one whose delusions related only to the extent of the victim's prior misconduct. The comment to MPC § 4.01 states: "Appreciating 'wrongfulness' may be taken to mean appreciating that the community regards the behavior as wrongful." *Id*. cmt. 3 at 169. In other words, so long as the defendant appreciated that the community at large would view the conduct as wrongful, the insanity defense is unavailable even if the defendant calculated that he would be performing a public good. The comment states that the two formulations would be little different in practice:

50

"Given the seriousness of most crimes for which the defense of insanity is interposed, a defendant who appreciates society's moral disapproval of his conduct will almost always assume that the conduct is criminal, and vice versa." *Id.*[3]

Turning to this case, the above authorities suggest that Mr. Diestel would

---

[3]The comment offered only two circumstances in which the difference in the two formulations could be significant:

First, where the wrongfulness standard is taken to refer to the actor's own moral perception, then differing results are conceivable under the two formulations in a case in which the defendant thinks that an act he knows to be legally prohibited is commanded by God or otherwise morally justified. However, even in such a case, a defendant in a jurisdiction having the criminality formulation could probably argue that his capacity to appreciate the criminality of his conduct was insubstantial or that he lacked substantial capacity to conform his conduct to legal requirements.

The second conceivable situation is where the actor possesses a sense of right and wrong with respect to his actions, but, as a result of mental defect, is incapable of grasping the concepts of governmental prohibition and officially imposed sanctions which are implicit in the notion of criminality. However, in such a case as well, a defendant in a jurisdiction with the wrongfulness formulation might argue that, for purposes of determining criminal responsibility, his capacity for appreciating the wrongfulness of his conduct was insubstantial, or that, in light of his inability to understand what the law is, he was incapable of conforming his conduct to its requirements. Hence, notwithstanding the theoretical distinction between the two formulations, it is doubtful whether the actual result in many cases would turn on which is used.

*Id*. at 169–170 (footnote omitted).

51

not be entitled to an insanity defense if his paranoid schizophrenia operated only to make him believe that Casey was an evil man who raped women and set fires. If he nevertheless understood that "the community regards [the murder of rapists and arsonists] as wrongful," MPC § 4.01 cmt. 3 at 169, he would be criminally responsible. If, however, his delusions went further and he thought that he had a mandate from God or President Clinton to kill Mr. Casey, or if he believed that Casey was not really a human being and that killing him would only remove an evil spirit, then he would be legally insane. The dispositive question, then, is whether the jury could properly have found beyond a reasonable doubt that Mr. Diestel did not suffer from one of these further delusions. Although there was evidence that he suffered from each of these delusions, that evidence was much weaker than the evidence that his paranoid schizophrenia induced delusions that Mr. Casey had committed numerous rapes and arsons. In our view, it was not unreasonable for the OCCA to determine that there was sufficient evidence for the jury to believe beyond a reasonable doubt that Mr. Diestel was legally sane.

## III. JURY INSTRUCTION

At trial Mr. Diestel sought the following jury instruction:

Under the law of the State of Oklahoma and the facts in this case, if you find the Defendant, William James Diestel, guilty of Murder in the First Degree, you shall fix his punishment as either, imprisonment for life without parole or imprisonment for life. If you find the Defendant, Williams James Diestel, not guilty by reason of insanity, the Defendant shall be committed to a State Hospital for the Mentally Ill where he shall remain until released pursuant to the laws

52

of the State of Oklahoma.

Aplt. Br. at 27 (internal quotation marks omitted).[4] The trial court rejected this instruction and did not instruct the jury at all on the consequences of a verdict of not guilty by reason of insanity (an NGI verdict). The OCCA affirmed the district court's rejection. Mr. Diestel contends that denial of the instruction violated his constitutional right to a fair trial.

Mr. Diestel is entitled to relief only if the OCCA's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). To make this showing, he must demonstrate that the state court either (1) "arrived at a conclusion opposite to that reached by the Supreme Court on a question of law, or decided the case differently than the Supreme Court has on a set of materially indistinguishable facts," or (2) "identified the correct governing legal principle from the Supreme Court's decisions but unreasonably applied this principle to the facts of his case." *Lee v. Crouse*, 451 F.3d 598, 603 (10th Cir. 2006) (brackets and internal quotation marks omitted).

Mr. Diestel's precise argument is unclear. He seems to contend that the OCCA incorrectly applied *Shannon v. United States*, 512 U.S. 573 (1994). Shannon was convicted of unlawful possession of a firearm by a felon, in

---

[4]The proposed instruction does not appear in the record, but the state does not dispute that it was requested.

violation of 18 U.S.C. § 922(g)(1), after he shot himself in the chest in the presence of a police officer. At trial Shannon claimed to be insane and unsuccessfully sought a jury instruction that an NGI verdict would result in his being involuntarily committed. After being convicted at trial, he appealed the denial of the instruction, arguing that both the Insanity Defense Reform Act of 1984 and "general federal criminal practice," *id.* at 584, required the instruction. The Supreme Court rejected both arguments.

Thus, *Shannon* decided that an instruction concerning the results of an NGI verdict was *not* required. Although the Court recognized that such an instruction might be necessary in "certain limited circumstances," 512 U.S. at 587, the only example provided by the Court of such a circumstance was a statement to the jury by a prosecutor or witness that the defendant would "go free" if the jury returned an NGI verdict. *Id.* (internal quotation marks omitted). That circumstance is not present here. Furthermore, *Shannon* was interpreting the requirements of (1) the Insanity Defense Reform Act of 1984, 18 U.S.C. §§ 17, 4241–4247, a federal statute governing federal criminal law and procedure, and (2) "general federal practice" under the Supreme Court's "supervisory power over the federal courts," *Shannon*, 512 U.S. at 575, 584. Neither would govern a state prosecution.

Mr. Diestel argues that *Shannon* should be distinguished because Oklahoma juries, unlike federal juries, have a role in sentencing. But that argument does not avail him. It would not be enough under AEDPA for Mr. Diestel to show that a

54

Supreme Court decision does not contradict his contention. Rather, he must show that a Supreme Court decision has clearly adopted his contention. This he has failed to do. The OCCA's decision did not contradict or misapply "clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1). Therefore, we cannot grant Mr. Diestel relief on this ground.

## IV.  CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment.

*Diestel v. Workman*, 06-7070

**HENRY, J.**, concurring.

I concur, based upon our standard of review, but write separately to note that this is a close and difficult case. The expert evidence in this case is one-sided, strongly suggesting that Mr. Diestel "was being directed by hallucinations," Rec. vol. VI, at 30, and thus was "incapable of knowing [the] wrongfulness" of his actions at the time of this tragic murder. Okla. Stat. Ann. tit. 21, §152(4). Dr. John Call, the State's expert witness, chose not to testify as to the ultimate issue of fact, although Oklahoma law allows it. Further troubling is the Oklahoma Court of Criminal Appeals' (OCCA) heavy reliance upon lay testimony of strangers—people who did not know or had merely had a casual brush with Mr. Diestel. *See Kiser v. Boone*, 4 F. App'x 736, 742 (10th Cir. 2001) (granting habeas relief for insufficiency of evidence that defendant was sane at the time of the homicide and noting that "'[b]efore a non-expert witness is competent to testify to the sanity or insanity of another person, he must show an acquaintance of such intimacy and duration as to clearly indicate that his testimony will be of value in determining the issue'") (quoting *McKenzie v. United States*, 266 F.2d 524, 526-27 (10th Cir. 1959)). Finally, I also take this opportunity to comment on a new and salutary development in Oklahoma law, which adopts the instruction Mr. Diestel unsuccessfully requested at trial, and

would have helped in this case.

1. Oklahoma's Evidentiary Rules

Unlike the Federal Rules of Evidence, Oklahoma law permits experts to testify as to whether a criminal defendant did or did not have the requisite mental state to commit the crime with which he has been charged. *Compare* 12 Okla. Stat. § 2704 ("Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.") *with* FED. R. EVID. 704(b) (prohibiting experts from testifying as to whether a criminal had "the mental state or condition constituting the mental state element of the crime charged"). Thus, under Oklahoma law, "[a]ny properly qualified expert testifying in accordance with the standards governing admissibility of expert testimony may offer an opinion on the ultimate issue if it would assist the trier of fact." *Johnson v. State*, 95 P.3d 1099, 1104 (Okla. Crim. App. 2004). Further, under Oklahoma law, "expert witnesses can suggest the inference which jurors should draw from the application of specialized knowledge to the facts." *Romano v. State*, 909 P.2d 92, 109 (Okla. Crim. App. 1995). However, Oklahoma law does not permit "opinion testimony which merely tells a jury what result to reach . . . ." *Id.*

Like Mr. Diestel's expert witnesses, Dr. Therese Hall and Dr. John Smith, Dr. Call, the State's expert, could properly have testified as to whether Mr.

2

Diestel had the mental capacity to have been criminally responsible. *See Coddington v. State*, 142 P.3d 437, 449 (Okla. Crim. App. 2006) ("Experts for the State routinely testify to conclusions drawn from their specialized knowledge even on ultimate issues."); *see also Lott v. State*, 98 P.3d 318, 342-343 (Okla. Crim. App. 2004) (holding that the State's expert on sexual assault could properly testify rape was result of non-consensual sex and conclude that oral sodomy had occurred based upon her examination of physical evidence); *Abshier v. State*, 28 P.3d 579, 604 (Okla. Crim. App. 2002) (concluding that the State's expert witness could testify that a child was conscious and crying during beating from defendant based upon his experience and studies), *rev'd on other grounds by Jones v. State*, 134 P.3d 150 (Okla. Crim. App. 2006); *Welch v. State*, 2 P.3d 356, 368-369 (Okla. Crim. App. 2000) (holding that the trial court did not err in allowing detective's testimony that victim's death was not accidental but intentionally inflicted).

Oklahoma law is perhaps superior to the Federal Rules: it seems to me if a qualified psychologist, or, better yet, the "only board-certified forensic psychologist" in the state, Maj. Op. at 30, has a clear opinion about whether a person knows the difference between right or wrong, it may well be helpful to a fair resolution of the case that he or she express it.[1]

_____

[1] Indeed, it appears that the OCCA believes that Dr. Call has expressed

(continued...)

3

2. Use of lay testimony

I am also troubled by the fact that the OCCA justified its decision in part by relying on the lay testimony of people that had no connection with the defendant at all. We condemned similar evidence in *Kiser v. Boone*, 4 F. App'x 736, 742 (10th Cir. 2001). Although *Kiser* is unpublished, its reasoning is the most analogous in our circuit.

In that case, the State's expert examined Mr. Kiser, the defendant, who had shot his wife's romantic partner one day after his wife filed for divorce, to determine whether or not Mr. Kiser was competent to stand trial. The expert did not examine Mr. Kiser to determine whether Mr. Kiser was sane at the time of the murder. *Id.* at 740. Mr. Kiser presented two experts, each of whom testified that he did not appreciate the wrongfulness of his actions at the time he shot the victim. *Id*. at 739. The State relied on lay witnesses to establish Mr. Kiser's sanity. A neighbor of the victim testified that the defendant, whom he had not previously met, appeared "nice" and "polite" on the day of the shooting. *Id.* at 741. A friend of the victim, who did not know Mr. Kiser before, testified to a

---

[1](...continued)
such an opinion before. *See Reid v. Boone*, 27 F. App'x 959, 962 (10th Cir. 2001) ("Dr. Call testified that, at the time of the killing, [the defendant] was suffering from a substance induce[d] psychotic disorder that included hallucinations. However, Dr. Call further testified that [the defendant] knew that he was committing a murder and knew that it was wrong.") (internal quotation marks and citations omitted).

conversation he had with the victim during which the victim confided his concern about a telephone call from Mr. Kiser threatening to kill him. *Id.*

The jury convicted Mr. Kiser of first degree murder, and the OCCA denied relief, finding Mr. Kiser's evidentiary sufficiency challenge to be meritless. 4 F. App'x at 741 (quoting *Kiser v. State*, 782 P.2d 405, 407 (Okla. Cr. App. 1989)). The federal magistrate judge reviewing Mr. Kiser's habeas petition recommended that relief be granted and the district court agreed. *Id.* Reviewing with AEDPA deference, we discounted the lay testimony provided by the two witnesses who had "no previous association" with Mr. Kiser. *Id.* at 742 (citing *McKenzie*, 266 F.2d at 526-27); *see also United States v. Madrid*, 673 F.2d 1114, 1123 (10th Cir. 1982) (applying *McKenzie*); *United States v. Coleman*, 501 F.2d 342, 345 (10th Cir. 1974) (same).

The *Kiser* court also rejected the OCCA's conclusion that the State expert had refuted the defense experts' testimony because the State's expert had acknowledged that he did not examine the defendant to ascertain the defendant's mental state at the time of the killing. Thus, the panel held that the defense experts' testimony "was overwhelming in light of the state's insufficient and indefinite evidence of his sanity." 4 F. App'x at 741.

In this case, the jury was presented with only mildly conflicting medical testimony regarding Mr. Diestel's condition. Unlike in *Kiser*, *all experts agreed* as to the severity of and the existence of Mr. Diestel's paranoid schizophrenia.

5

Admittedly, the State's expert in *Kiser* only evaluated Mr. Kiser for competency, and here, "Dr. Call focused on Mr. Diestel's state of mind at the time of the offense." Maj. Op. at 48. However, Mr. Diestel's defense seems significantly stronger – unlike in *Kiser*, the State's expert here did not suggest the defense was a "cop out" or "nonsense." 4 F. App'x at 740.

Additionally, the State presented *no* lay testimony from *any* witness who had *any* previous association with Mr. Diestel before briefly encountering him on the day of the shooting. We acknowledge, as the State points out, "[l]ay witnesses can testify about their observations of defendants if those observations are reasonably proximate in time to the proceedings." *McGregor v. State,* 885 P.2d 1366, 1374 (Okla. Crim. App. 1994). Oklahoma law also allows "[l]ay witnesses [to] give an opinion as to whether a defendant knew right from wrong at the time of crime if the opinion is rationally based on witness perception and helpful to a clear understanding of the testimony or determination of the fact in issue." *Id.* (emphasis added). "A jury can disregard entirely the testimony of psychiatric or medical experts and find sanity from the testimony of lay witnesses alone." *Id.* at 1376.

It is worth noting, however, that in *McGregor*, a fellow inmate who had observed the defendant over a period of time provided testimony regarding the defendant's competency. Here, none of the State's lay witnesses had "an acquaintance" with Mr. Diestel of any "intimacy" over a period of time of any

6

significance. *McKenzie*, 266 F.2d at 566.

Given the above and given what Dr. Call said regarding Mr. Diestel's mental state,[2] I cannot say that, absent AEDPA's strictures, I could affirm the OCCA's legal conclusion that Mr. Diestel was sane at the time of the crime.

3. Not Guilty by Reason of Insanity Jury Instruction

Finally, as to the requested jury instruction, the consequences of a verdict of not guilty by reason of insanity in Oklahoma is clear: the court

> shall thereupon order the defendant committed to the state hospital for the mentally ill, or other state institution provided for the care and treatment of cases such as the one before the court, until the sanity and soundness of mind of the defendant be judicially determined, and such person be discharged from the institution according to law.

Okla. Stat. Ann., tit. 22, § 925.

---

[2] Dr. Call's testimony noted that Mr. Diestel:
- had "command delusions," Supp. Rec. vol. VI, at 21;
- suffered from paranoid schizophrenia prior to and on the date of the homicide, *id.* at 24, 26, 31, 32;
- thought his victim was "Nero reincarnated," *id.* at 31;
- was "mentally disturbed," *id.* at 24;
- had a lengthy obsession with the victim , that "even to a psychologist" would be a "red flag," *id.* at 25;
- was found not competent to stand trial on Nov. 9, *id.* at 27;
- believed he was being directed by hallucinations, and that "he believed that he had this delusion that the individual and the victim was [sic] Nero and a bad person and that he needed to do something to this fellow," *id.* at 30; or, as he puts it again "That he also believed that Mr. Casey was an evil man, the Roman Emperor Nero reincarnated, a man who raped a woman and who set fires in California." *Id.* at 31.

7

Mr. Diestel proposed the following instruction, which the trial court

refused to give:

> Under the law of the State of Oklahoma and the facts of this case, if you
> find the Defendant, William James Diestel, guilty of Murder in the First
> Degree, you shall fix his punishment as either, imprisonment for life
> without parole or imprisonment for life. If you find the Defendant,
> William James Diestel, not guilty by reason of insanity, the Defendant
> shall be committed to a State Hospital for the Mentally Ill where he
> shall remain until released pursuant to the laws of the State of
> Oklahoma.

Aple's App. at 32.

In denying relief on this claim, the Court of Criminal Appeals quoted from

its decision in *Ullery v. State*, 988 P.2d 332, 346 (Okla. Crim. App. 1999):

> Ullery claims he was denied due process and a fair trial by the trial
> court's refusal to instruct the jury on the dispositional consequences of
> a not guilty by reason of insanity verdict. Ullery never contested the
> State's allegation that he killed Neal. During individual voir dire
> counsel told prospective jurors that Ullery admitted the killing and
> relied solely on his insanity defense. *The trial court denied Ullery's
> repeated requests to instruct the jury on the consequences of a verdict
> of not guilty by reason of insanity, as well as his offer of testimony on
> this issue. . . .*
>
> The[] trial court based its rulings in a belief that an instruction on the
> consequences of a not guilty by reason of insanity verdict is not
> permitted. *This Court has held failure to give such an instruction was
> not error because the statutory mandatory commitment procedures are
> "merely a procedural statement of disposition subsequent to the verdict
> and [are] immaterial to the process of rendering a verdict concerning*

8

*the sanity of the accused.*"  The United States Supreme Court held in *Shannon v. United States*, [512 U.S. 573, 575 (1994)], *that federal law does not require this instruction.* The Supreme Court analogized to the situation where the State fails to meet its burden of proof regarding guilt, noting there the system assumes a juror will vote to acquit even if the juror is convinced the defendant is dangerous and should be imprisoned. We decline to revisit these decisions in this case. This proposition is denied.

*Diestel v. State*, No. F-2001-1501 slip op. at 12-13 (filed Nov. 13, 2002) (quoting *Ullery*, 988 P.2d at 346) (emphasis added) (footnotes and some internal citations omitted).

But the distinction between *Shannon*, which applied federal law, and Oklahoma law, is noteworthy:  "In reaching its conclusion, the Court noted the well-established principle that, 'when a jury has no sentencing function, it should be admonished to reach its verdict without regard to what sentence might be imposed.'" *Neely v. Newton*, 149 F.3d 1074, 1085 (10th Cir. 1998) (quoting *Shannon*, 512 U.S. at 579) (internal quotation marks omitted)).  Under Oklahoma law, there is no question that the jury serves the *absolute* sentencing function. Moreover, the jurors in *Shannon*, unlike the jurors here, were instructed to disregard the consequences of their verdict.

In *Fears v. State*, No. F-2004-1279 (Okla. Crim. App. filed July 7, 2006),[3]

---

[3]  *Fears* was filed after the Magistrate Judge issued her report and recommendation (April 13, 2006) (which recommended the grant of habeas relief as to the sufficiency of evidence), and after the district court filed its order

(continued...)

9

the OCCA held that "[l]aw, logic, fundamental fairness and common sense require that juries be told [of] the consequences of their verdict, not guilty by reason of insanity." *Id.* slip. op. at 19. As the OCCA points outs, at least twenty-five states require a jury instruction on the consequences of a verdict of not guilty by reason of insanity, and eleven require the instruction by statute. *Id.* at 11-13 & nn.26-27. "In most of these jurisdictions, juries do *not* impose sentence." *Id.* at 12-13. The *Fears* decision, which I recognize is unpublished and which is not retroactive to cases on habeas review, laudably recognizes that Oklahoma jurors imposing

---

[3](...continued)
denying federal habeas relief (June 21, 2006). As the State points out, Mr. Diestel did not file an objection to the magistrate judge's report and recommendation regarding the NGRI jury instruction. "[W]e have adopted a firm waiver rule when a party fails to object to the findings and recommendations of the magistrate [judge]." *Moore v. United States*, 950 F.2d 656, 659 (10th Cir.1991).

Under our "firm waiver rule," a party who fails to file timely objections to a magistrate judge's report and recommendation waives appellate review. *Wirsching v. Colorado*, 360 F.3d 1191, 1197 (10th Cir. 2004) (internal quotation marks omitted).

The firm waiver rule, however, does not apply (1) when a pro se litigant was not notified of the time period for filing an objection and the consequences for failing to do so, (2) when the interests of justice warrant, or (3) when the party that failed to object makes a showing of plain error. *See Wardell v. Duncan*, 470 F.3d 954, 958 (10th Cir. 2006). Here, we granted a certificate of appealability because Mr. Diestel had "demonstrate[d] that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong" and therefore made "a substantial showing of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); 28 U.S.C. § 2253(c)(2)-(3). There is little doubt that such showing, bolstered by the OCCA's *Fears* decision, which signifies a tactical shift in the OCCA's approach to NGRI jury instructions requires our review in the interest of justice.

sentences must be informed of accurate information about sentencing

consequences. *Id.* at 14.

*Fears* brings Oklahoma law in line with the recommendations of both the

National Alliance of Mental Illness (NAMI) and the American Bar Association

(ABA). NAMI has long urged the following:

> At the very least, judges should be required to instruct juries . . . as to what will happen to a defendant found not guilty by reason of insanity: that they will be hospitalized in secure facilities for treatment, and if they ever recover sufficiently to return to the community, they will be subject to continued monitoring.[4]

Similarly, the ABA has concluded that a "court should instruct the jury as to the

dispositional consequences of a verdict of not guilty by reason of [insanity]."

ABA, Criminal Justice Mental Health Standards § 7-6.8 cmt. at 342 (1986)

(brackets in original). "[J]urors who are not informed about dispositional

consequences will speculate about the practical results of a nonresponsibility

verdict and, in ignorance of reality, will convict persons who are not criminally

responsible in order to protect society." *Id.* at 345. The ABA concluded that an

instruction was "the most sensible approach given the potential for prejudice," *id.*,

when no instruction is provided, and observed the following:

Particularly in cases in which defendants are charged with violent

---

[4] Richard Birkel, Ph.D, NAMI National Director, and Mark Hardwick, Ph.D., President, NAMI Texas, *Change the Law Instead*, available at http://www.namiscc.org/newsletters/February02/AndreaYates.htm.

11

crimes (which is usually the case if the nonresponsibility issue is tried to a jury, as opposed to a judge), juries need to be told about the effect of a finding of mental nonresponsibility [insanity] if the possibility of a serious injustice is to be avoided.

*Id.* (brackets in original).

In the end, I would prefer that the proposed instruction had been given, as it seems the "most sensible approach" as held in *Fears*. *See* slip op. at 19. I thus agree that, given AEDPA deference, the OCCA did not unreasonably apply federal law as to the sufficiency of the evidence regarding Mr. Diestel's mental state. I also agree that the OCCA did not misapply clearly established *federal* law when it refused to give the now-approved *Fears* instruction. If Mr. Diestel did know the difference between right and wrong at the time of the horrible murder of Mr. Casey, Mr. Diestel deserves the sentence he received. If, as considerable evidence indicates, Mr. Diestel is seriously mentally deranged, life imprisonment in a maximum security prison seems unlikely to be an intelligent choice. Had *Fears* been the law, we would have a better idea of what the jury believed to be the truth.

<u>Diestel v. Workman</u>, 06-7070

**LUCERO, J.,** concurring.

I join the majority opinion, save the discussion of Fed. R. Evid. 704(b) on pages 41-42, and I join as well Part 1 of Judge Henry's concurrence relating to the applicable Oklahoma evidentiary rule. I write separately to note my disagreement with reliance on the Federal Rules of Evidence in evaluating the sufficiency of the evidence in a state court case. Maj. Op. at 41.

It is not ours to speculate about how the evidence might have been interpreted if the trial had occurred in federal court. <u>Id.</u> at 42 ("[W]hen assessing the reasonableness of the verdict, it is worth noting that the evidence on which Mr. Diestel most relies would not even have been admissible in a federal trial."). Although AEDPA requires us to determine if the state court decision involves an unreasonable application of federal law, this duty is not an invitation to apply federal procedural rules to state court proceedings. Federal Rules of Evidence are irrelevant to this case. Future litigants should not be able to cite to the federal rules when arguing the sufficiency of the evidence in state court proceedings.

As Judge Henry notes, the applicable Oklahoma evidentiary rule allows experts to testify to ultimate issues, whereas Rule 704(b) does not. Because Rule 704(b) is both inapplicable and in direct conflict with the state rule, its citation is particularly inappropriate.